102416miller

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES of AMERICA,

     -against-             16 Cr. 666 (KMK)

ANTON MILLER,

            DEFENDANT.

------------------------------------x

                      United States Courthouse
                      White Plains, New York

                      October 24, 2016
                      12:05 p.m.

B e f o r e:

                      HON. KENNETH M. KARAS,
                      UNITED STATES DISTRICT COURT JUDGE

A P P E A R A N C E S:

HAGAN SCOTTEN
CHRISTOPHER CLORE
       Assistant United States Attorneys

DAVID GOLDSTEIN
       Attorney  for Anton Miller

P R O C E E D I N G S

(Case called)

MR. SCOTTEN:  Good afternoon, your Honor.  Hagan Scotten and Christopher Clore for the government.

THE COURT:  Good afternoon to you both.

MR. GOLDSTEIN:  For the defendant, David Goldstein.

THE COURT:  Good afternoon to you both.  Please be seated.  It's been a while, Mr. Goldstein.

MR. GOLDSTEIN:  Yes, it has.

THE COURT:  So, we're here because the government is seeking to appeal the determination by Judge McCarthy to grant Mr. Miller bail $100,000, right, secured by --

MR. GOLDSTEIN:  Two pieces of property:  One is the house his mother owns, and the other his stepmother owns.

MR. SCOTTEN:  He has two cosigners.

THE COURT:  I gather, we're still missing the transcript.

MR. SCOTTEN:  That is correct, your Honor.  It was requested last week.  We asked about it again this morning, and the reporters simply don't have it ready.  The latest time estimate was by the end of business today.

THE COURT:  All right.  It's your application.  Go ahead.

MR. SCOTTEN:  Thanks, your Honor.  You have our letter.  And I will try not to repeat unduly what's in the letter, but

rather just emphasize a couple of points on each of the four statutory factors.

THE COURT: Please.

MR. SCOTTEN: As to the first, nature and circumstances of the offense, the statute precedent shows that clearly supports detention, but what I wanted to emphasize here was the scale of this conspiracy. I think often these are viewed through the lens of the sort of street-level narcotics conspiracy that is more commonly the subject of charges here. This is not that.

This is a conspiracy that over the approximate three-year period, probably shipped about 150 kilograms of cocaine. I say probably only because their volume ranged from five to ten kilograms per month, so we can't estimate each month independently. That has a lot of ramifications for purpose of bail: Defendant's resources to flee, defendant's ability to carry on very dangerous activity remotely because they don't need to be selling on a street corner, and the one wanted to stress today was incentive to flee.

As you know, there's a ten-year mandatory minimum in this case, which is not unheard of in narcotics charges here. Mr. Miller's guidelines would actually be considerably higher than that, just based on the amount of traffic involved in the conspiracy. It is also the case that he has a prior narcotics felony, and the office is currently considering whether to file

a prior felony information based on his prior narcotics felony that would double his mandatory minimum to 20 years. He has extensive incentive to flee here based on the scale of the conspiracy.

As to the second factor, the weight of the evidence, the weight of the evidence here I think is overwhelming. It would probably be easiest to look at it in two steps: First, the evidence of the conspiracy as a whole, and then the evidence of Mr. Miller's connection to it.

As to the conspiracy as a whole, there are nine kilograms of cocaine in evidence. There are extensive wiretap recordings from five different members of the conspiracy, including this defendant, also its senior leader, Mr. Kinyon, its two principal couriers, Ramel Hern and Marcus Fisher, and one of its most prominent customers, Ricardo Langston.

Those wiretaps are not subtle. They reflect a daily transaction of money and drugs with amounts given to be received, amounts to be paid, drugs regularly delivered, and then money regularly collected to be brought back to the west coast, where the organization purchased wholesale quantities of cocaine from its source that Kinyon himself referred to as the cartel people.

Then if you look at this defendant in particular, witnesses who either are proffering with the government or are already sort of viewed as fully corroborated by the government

would name him as the second-in-command of this organization that is fully supported by the wiretap traffic. And this defendant was intercepted on the wiretap of Malcolm Kinyon's phone before his own phone was tapped discussing business, discussing the loss of a multikilogram cocaine package, or discussing a $15,000 investment this defendant was making in cocaine.

He was then intercepted on the wiretap of his own phone after Kinyon's arrest when members of this organization essentially turned to him as the leader. You can see them calling him, asking him what to do. You can see him reaching out to collect debts referring to knocking heads in order to get together the debts that were owed to Kinyon before he went in. And he also shows up on the phone calls of coconspirators, so calls that this defendant is not a party to, but where other members of the conspiracy would say we're turning to "Nord," that being his alias, now, or, yeah, he's Kinyon's right-hand man. I think his role in the conspiracy is also beyond reasonable dispute and the evidence of it is overwhelming.

With respect to the third factor, the history and characteristics of the defendant, there are really two aspects to this, I'd stress. As the Court knows, he has a prior narcotics felony, which is indicative of how difficult it is to deter him. I think in the Court below, there was some suggestion this shouldn't be taken too seriously because he does

not have recent prior felony convictions, or, for that matter, recent convictions.

Given the nature of this offense, I don't think that's really an accurate barometer. This is, again, not a street-level narcotics conspiracy. Street-level dealers will often encounter law enforcement by virtue of their presence on the street or because they can easily be bought into by confidential informants or undercover officers. And therefore, they will be expected to incur a regular amount of arrests as long as they're doing business out there. That is not this defendant.

This defendant is a higher level member of a higher level organization; and therefore, he wouldn't be expected to regularly encounter law enforcement. If they were successful in carrying out their business, as the evidence shows they were, he would not regularly be arrested. So the fact that he doesn't have recent conviction is in no way indicative of him not being involved in the narcotics trade essentially since the inception of this organization, which is what the evidence indicates he was.

The second factor in the history and characteristics that I wanted to stress briefly is his relative lack of ties to the community. He does not live at the address on his driver's license. He does not have a phone in his own name. He drives a car that is in the name the leader of the conspiracy, Malcolm

Kinyon.

Against that, yes, he turned himself in, and that is obviously his single-best factor. But for some of the reasons explored in our letter and a couple other I'd like to mention today, I don't think that is in any way dispositive. In addition to what we discussed in our letter, I'd note that this defendant's understanding of his incentives may be changing as he learns more about the case.

It was one thing for him to turn himself in a week ago knowing what little he knew then. He learned more about the strength of the government's case at the first bail argument. He's learning still more today. He'll learn still more on Friday when discovery is produced. Given that all that evidence together shows really an overwhelming case against him, and he is learning, I think for the first time, the real nature of the statutory penalties he's likely to face, his calculus, his incentives to flee increase greatly since he turned himself in, and they may change further throughout the course of the case. So, his turning himself in once is, as I think prior experience shows, no guarantee that he will continue to appear for court again.

Very briefly on the last of the four factors, your Honor, I think the case on risk of flight is really overwhelming, but I also think the case on danger is quite strong. In particular, the collection of debts of a narcotics

organization is a dangerous activity. I think the second-to-last page of Exhibit A, which your Honor has, reflects somebody, someone who is unarrested, reporting to Mr. Miller that he was about to assault someone to collect a debt. Fortunately, that person was so scared, he gave up the money immediately, but this is a dangerous activity in which the defendant has engaged. Nor did he cease engaging in narcotics when Kinyon was arrested.

We do think it's the case that after Kinyon's arrest, the organization is no longer able to traffic the tens of kilograms of cocaine it did, but if you look at the fourth-to-last page of Exhibit A, for example, you can see the defendant engaged in what looks like much smaller-scale narcotics transactions where he expressly refers to dope fiends as his customers, so there's really no ambiguity there.

In sum, I think each of the four statutory factors supports detention here; that is, coupled with a statutory presumption in favor of detention, and given the overwhelming evidence in this case, and the scales of conspiracy, there just are not any conditions that can be counted on to either assure this defendant's future appearance in court or the safety of the community.

THE COURT: Thank you.

Mr. Goldstein.

MR. GOLDSTEIN: Thank you, Judge.

Judge, in reading the cases that deal with the appeal of a bail determination, obviously, this Court is free to make whatever independent determination it makes. But the cases do say that the court should consider the minutes of the bail application, and also consider what the magistrate did. The court is free to reject the magistrate's conclusion and the court is supposed to make its own independent determination. But it seems to me that the government is basically asking this Court to ignore a number of factors in making its request to have my client detained.

Initially, as I pointed out in my letter, we argued for about an hour before the magistrate, and during that entire argument, the government never ever suggested to the magistrate that my client was a risk of flight.

As a matter of fact, the magistrate specifically asked Mr. Clore are you arguing that this defendant is a risk of flight. Mr. Clore said no. And I think that the argument that he's a risk of flight is wanting significantly.

The government claims that my client has learned more about this case now than he knew prior to his surrender. The letter that the government submitted suggests he waited six days to surrender. The government makes arguments that I suggest are contradicted by the record concerning now he's aware of the penalties.

This defendant came to my office Friday morning. This

take-down occurred Thursday. We spoke for probably about an hour. I explained to the defendant what mandatory minimum he was facing, told him he wouldn't be eligible for the safety valve because his criminal record was such that he didn't qualify for the safety valve. I explained to him that the best he would end up doing, assuming he wanted to take a plea, was probably ten years. The defendant said to me, I want you to make arrangements to surrender me. I am not going to run.

THE COURT: Is your client okay with you sharing privileged communications here?

MR. GOLDSTEIN: I'm not going to say anything about the case other than --

THE COURT: Okay.

MR. GOLDSTEIN: -- than what I just said.

THE COURT: Okay.

MR. GOLDSTEIN: I went on the Internet. I obtained stuff from the Internet concerning this case. So to say he didn't know what the case was all about is sort of not fair. He knew what the case was about. His stepmother retained me Monday afternoon. I sent a letter to Mr. Ali, and unbeknownst to me, he was out because he's out on paternity leave, and when he didn't answer, I sent an email to Mr. Clore Tuesday morning saying that my client wanted to surrender. We arranged the surrender for Wednesday morning because I was unavailable on Tuesday for 10 o'clock in the morning.

Mr. Miller met me at 9:00 in the morning at the Galleria Mall. We talked for a little while, and at 10:05, we got here a few minutes late, he presented himself in front of the courthouse to the marshals who were looking for him.

These are hardly the actions of someone who is not an intelligent person and someone who, according to the government, if he's this big narcotics dealer, he certainly has the resources and the wherewithal to flee. He knew he was being looked for because marshals went to the house where he was living in New Jersey. He knew he was being looked for -- if he didn't know then, he knew it when I went on the Internet and got an indictment charging him as a coconspirator in a more-than-5-kilogram conspiracy.

So, I just find it difficult in light of the government's failure to make the argument before the magistrate -- and I know they can make whatever arguments they want now, they can introduce whatever additional evidence they want now, but I don't quite understand how from last Wednesday until Thursday, when they wrote this letter to you, the government's view concerning whether he was a risk of flight changed dramatically.

THE COURT: Well, because from you're perspective, there's nothing new.

MR. GOLDSTEIN: Correct.

THE COURT: And they argue it solely as danger to the

community.

MR. GOLDSTEIN: That's the only argument they made, and if you had the minutes, you'd see that.

THE COURT: Yes.

MR. GOLDSTEIN: The government also minimized the security here. The government writes it's improper to release this defendant on $100,000 PRB, but that not really what this bail is, and, really, the amount of the PRB is not important. It could have been $250,000. It's really irrelevant.

What's important, and the government seems to forget, is the security. The defendant has offered the homes where his mother lives, and just so the Court knows, his mother traveled up from Charlotte, North Carolina, to be in court today, and she is a retired New York state corrections officer. So, she is certainly a responsible person who lives in a house and is putting up the house for her son. His father remarried, and the defendant has such a good relationship with his stepmother, that his stepmother is willing to put up her house to secure this defendant's release. Apparently, the government doesn't think too much of that, but I think the magistrate was very impressed by that fact. And again, that's in the minutes.

The government also, because they didn't give you the minutes, doesn't talk very much about what Magistrate McCarthy did upon being presented with this bail application. She didn't render an off-the-cuff immediate determination: You know

something, this is going to be my decision. She talked to not one, but two representatives of the Pretrial Services Agency, Mr. Adams, and Leo Barrios, who happened to be in the courtroom at the time, who is the electronic monitoring guy, excuse my French. And she took them both in the back and spoke to them for 10 or 15 minutes, and, I assume, part of her determination, I can't know what's in her mind, is based on what they said to her.

The government, again, doesn't put too much stock in home detention. And I think taking the government's argument to its logical conclusion, I think the government is suggesting that in every case where a defendant is charged with being not a street seller, but on a higher level than that, home detention is no good -- not good enough. And that's not really accurate because I've been around here a long time, and I've gotten home detention for many, many narcotics dealers, and the lion's share of them didn't go anywhere.

And again, he's demonstrated -- forget about what I'm saying. You know the old adage, actions speak louder than words? I don't know how anybody can demonstrate responsibility other than by doing what he did.

The government points to his record. Yes, he has a record. And ordinarily, I don't point to my client's record as some badge of honor, but if you look at his record, he's been arrested a number of times, he has never, and I don't -- never

means not once not ever -- bench warranted, has never failed to appear in court. I know he's not facing the same amount of years in this case that he was facing in those cases, but in one of those cases, he was facing a life sentence.

The prior narcotics case at that time, the law in New York state was there was a mandatory minimum sentence. To be sure, it was less than the ten years we're talking about here, but he was facing, at a maximum, a life sentence. I'm not telling you everybody in state gets life because they don't, but in the same way, he's not getting life in this case, regardless of what his guidelines come out to be. So, in the end, the exposure to life is the exposure to life. And he showed up. He got out. Showed up. He was on probation. Completed his probation.

Now, the government has made an argument which is sort of similar to the argument Mr. Clore made to the magistrate: Well, he continued to deal in narcotics after Mr. Kinyon got arrested.

I briefly looked at the call logs of these conversations. The majority of these conversations, and to be sure, my client and Mr. Kinyon have been friends since they were 10 years old. And I look at these conversations. I don't come out of it with the same result, opinion that the government does which, I guess, is because we're on opposite sides of this podium here.

My client -- a lot of these conversations, and if you look at page 22 of 50 and page 9 of 50, my client is trying to get money so that he can help get Mr. Kinyon a lawyer. And if I were in jail, I would hope that my best friend would try to help me out when I was not capable of helping myself.

In a couple of the conversations, he's saying I don't have anything, I can't help. So, this big narcotics dealer has not enough money to help out his friend. He's trying to get money together to help his friend get a lawyer.

One thing I didn't notice in connection with the government's argument last week or today, is that anybody, anybody says -- and there were tapping his phone for months, and although nobody admitted it, this is not my first rodeo, I assume after Mr. Kinyon was arrested because, according to the government today, they believe he was sort of Mr. Kinyon's second-in-command, I assume if they heard somewhere that he was going to get involved in something, they would have done some surveillance, just to see what it was he's doing, you know, meeting with the coconspirators, carrying around bags, talking about receiving drugs, selling drugs.

And all the government could come up with, and I guess this is the best they had, because if it were me, I would submit to the Court the things that I think show this defendant in the worst light, but there's nothing at all to show that he was involved in any narcotics activity. To be sure, he may have

talked about dope fiends, but that hardly makes him a wholesale drug dealer.

Also, a few other things, a number of the other defendants in this case have been released on bail. And I'm not suggesting to you, and I didn't suggest to Magistrate McCarthy, that because other defendants were released means this defendant has to get released. But the government opposed bail for, I believe, four or five of the other defendants who were released on far lesser packages than my client. I checked the docket sheets. And I apologize if I get it inaccurately, it's because of my faulty memory because of old age, not because I'm intentionally trying to mislead anyone, that the other defendants got released simply on personal recognizance bonds. A couple of them were signed by their parents. I didn't see anyone who put up property. So, the government is going to argue, yeah, but your client was more culpable. Well, he's putting up a lot more security.

Also, on the issue of dangerousness, I think the Court should consider the following: After Mr. Kinyon got arrested, my client, forget about what he was doing before, did a few things that indicate to me, and I hope indicate to you, that he was walking the straight and narrow. He ended up getting an asbestos license from the state of New York and worked on an asbestos job. Unfortunately, because the job ended, he only worked three or four weeks, but he got an asbestos license.

He applied for a CDL license, which is a permit, rather, which is a permit, so that he can be able to drive a truck and was about to enter a -- you have to go to school and then you take a test to get a CDL license. He was about to do that when this came down.

And I know the government is going to say, yeah, Judge, but look at these conversations. He didn't change too much. But some of these conversations are months ago and not as recent. Also, there are a number of different ways this can be looked at. You know, the government says he can be on home detention and still conduct narcotics transactions. I guess that's the same for anybody and everybody in his situation. But the way I see this here, certainly, if he's on home detention, he's not going out anywhere to do anything. He's not meeting with anybody. And in this kind of business, I think it's kind of hard to be involved without being able to go out and meet with people.

The government also talked about somebody knocking heads. That's not him. There is nothing in this case that would indicate - and I'm talking about the literal dangerousness as opposed to the dangerousness presumption that's created by the statute - nothing here that this defendant ever had a gun, threatened anybody with a gun, threatened to beat anybody up, did anything to anybody that would indicate that he's the literal danger to society.

I know the cases say drug dealing is danger. Understood. But it seems to me that considering what the defendant did to show his sense of responsibility, the fact that people are willing to put up their homes for him -- I forgot to mention he has a 3-year-old and a 6-month-old child, who he doesn't plan on leaving. And I also found out when I spoke to his mother that he also helped raise his brother's son after his brother was killed some time ago.

So, I think he has shown to you that he is responsible and that he certainly will be here when he is required to be here. He is amenable, in terms of the dangerousness issue, to any conditions the Court wants to impose. If the Court wants to impose a condition I don't want him to use a cell phone, he is willing not to use a cell phone. And there are ways that law enforcement can find out whether or not someone is using a cell phone or a computer or anything else in the location where he's under house arrest.

THE COURT: If he did that, what if he wanted to call his lawyer?

MR. GOLDSTEIN: Then somebody else would call his lawyer, his aunt, the person with whom he's living.

THE COURT: Okay.

MR. GOLDSTEIN: I don't know what more a person could do than he has already done to show his responsibility. And, as I said, he is willing to do anything, to abide by any condition

that the Court deems appropriate to show that he's not a danger to anybody. And, again, the government was wiretapping his phone for months. And if this is the best they got, I disagree that this is the strongest case in the world. Obviously, they may have informants. I don't know. I don't even want to get into that, but the magistrate, Magistrate McCarthy -- and I don't know her, I don't know her reputation, but I heard she's not the most liberal of magistrates -- she deliberated --

THE COURT: What the hell does that mean?

MR. GOLDSTEIN: She's not prone to giving everybody bail.

THE COURT: All right.

MR. GOLDSTEIN: And she even said that she detained someone who surrendered a few days before. I'm sorry.

She deliberated for about 15 or 20 minutes before she made this decision, and it was a measured, thoughtful decision, and obviously, as far as I'm concerned, it was the right decision. And the standard is the government has to show by clear and convincing evidence that the defendant presents a danger. It's a little bit of a different standard than risk of flight. And my position is, what they have shown, when compared to what I've argued, is not clear and convincing evidence that he's a danger to the community. And I would ask that the Court affirm the decision of the magistrate granting him bail under the conditions that are on the docket sheet.

THE COURT: Thank you, Mr. Goldstein.

Mr. Clore.

MR. SCOTTEN: Just a few points in response. I suppose we should start with the calls. Factually, he's wrong. His wire phone was actually wiretapped for less than 30 days and it produced such calls as this, and I apologize, I'm going to read it.

THE COURT: Tell me what page you're on.

MR. SCOTTEN: These aren't well numbered. It's the second-to-last page of Exhibit A. That's probably the easiest way for the Court to find it.

THE COURT: What does it say at the top?

MR. SCOTTEN: It says incoming caller, I/C, from Tree.

THE COURT: Second-to-last page.

MR. SCOTTEN: Second-to-last page, your Honor.

THE COURT: Do you have the docket? The way it got docketed, it looks like it says page 26 of 27.

MR. GOLDSTEIN: Bottom left.

MR. SCOTTEN: It's going to say on the bottom -- unfortunately, I didn't print the docket version out.

THE COURT: What does it say on the bottom?

MR. SCOTTEN: Four of nine.

THE COURT: Okay. I got it.

MR. SCOTTEN: I apologize. I'm going to read it with all its profanity.

102416m iller

THE COURT: Oh, come on. Prosecutor's live for that stuff. Go ahead.

MR. SCOTTEN: Well, I'm not -- I was about to wash that nigger. He was so scared, nigger shit his pants, bro.

That's the person he's talking to.

Miller: He give you the bread?

"T" for Tree: He gave it up right away.

They go on talking about it a bit more. This is not a non-dangerous defendant, your Honor.

I was about to wash him.

And if we needed to put an agent on the stand to testify to the obvious that that means beat him up -- I was about to beat somebody up to get that debt.

What does Mr. Miller care about?

Did you get the money?

Yes, I did.

This is not a nondangerous defendant. That's just one of the last calls of the very brief interception of his phone. Most of the other calls in which he's intercepted are with Kinyon, on the earlier wiretap Mr. Kinyon's phone, so they're less frequent. Those are back and forth about quantities.

I got four. I gave him five. Is he up to nine now?

Based on interception of packages, very express discussions about scales, about the quality of the cocaine, it's not at all difficult to show those are 100 gram quantities of

cocaine -- I gave him 400 grams. Is he up to 900 grams now? The investment of $15,000. They're not unclear calls, especially when corroborated by nine actual kilograms of cocaine that were seized from shipments.

When Mr. Miller talks to Mr. Kinyon about Kinyon having lost a package, that's a package that's in the evidence locker. That's 2.3 kilograms of cocaine that can be shown in time to match up with that call. So, again, there there's no ambiguity here.

As for surveillance, surveilling Mr. Miller doesn't reveal much. You see him driving around, going in and out of his car, which is entirely consistent with our view of the case. The surveillance photo of an ATM at Mr. Kinyon's bank account also shows him putting in cash into Mr. Kinyon's account. The testimony of a UPS employee would also reflect Mr. Miller picking up packages, identical in size, content, addressing, to the intercepted multikilogram packages. So, this is not a case where the wiretap is uncorroborated.

THE COURT: How come you guys didn't argue risk of flight to Judge McCarthy?

MR. SCOTTEN: My understanding from talking to Mr. Clore is we did. We certainly did not emphasize it. And to the extent the Court finds the transcript dispositive --

THE COURT: Mr. Goldstein looks really mad.

MR. GOLDSTEIN: Excuse me, Judge. I was there.

THE COURT: Yes.

MR. GOLDSTEIN: Mr. Clore was asked, Are you arguing risk of flight? He said no. So I don't know what could be more clear than that.

MR. SCOTTEN: So I guess, to the extent the Court cared about the transcript, Mr. Clore can stand up, but I don't want to make it a contest of credibility between attorneys, the reason we are doing this as early as possible is the defendant's liberty if he's supposed to be on bail. If the Court wants to wait for the transcript, certainly the government has no objection, but I don't think the Court needs to because, as my friend points out, this is a *de novo* standard. It wouldn't really matter what had been argued below. I think it's a distraction.

I think we felt like we had very strong arguments on dangerousness and still do. So, Mr. Clore certainly didn't emphasize flight; that is not our contention. But that is of no bearing here. I think Mr. Greenfield is right to point out that Judge McCarthy --

MR. GOLDSTEIN: Goldstein.

MR. SCOTTEN: My apologies. Mr. Goldstein is right to point out that Judge McCarthy is a very cautious judge, a very careful judge, and we're not saying otherwise. He is also right that she detained someone a few days earlier who had turned himself in and detained a member of this conspiracy who turned

himself in a day after that.

THE COURT: Which way does that cut?

MR. SCOTTEN: I think it cuts in the following way: It shows that turning yourself in isn't dispositive.

THE COURT: Right, but it also shows that she didn't have some sort of knee-jerk reaction to turning himself in if this was a factor that cut in this case in Mr. Miller's favor, even though it didn't cut enough in the favor of those other individuals who sought a bail package, right?

MR. SCOTTEN: I think that's exactly right, but there's no argument from the government that there was any intemperate, knee-jerk, ill-reasoned about Judge McCarthy's opinion. We disagree with it. We think that it doesn't properly weight the statutory factors, but it's not our contention she was hasty or knee-jerk in anyway.

I think she placed a lot of emphasis on the Pretrial Services Report, but the Court should bear in mind that Pretrial Services does not consider every factor. They don't consider weight of the evidence. They don't consider statutory presumptions. That's not their role. There's nothing wrong for them to do that, but it means their determinations are incomplete at best given that the statute actually encourages consideration of those factors.

Also on that subject of pretrial recommendations, it's not just the government saying that home detention might not

102416m Miller

suffice here. Precedent is pretty clear that in sort of organized crime-type cases, home detention will typically be inadequate. It's not our submission that it could never be inadequate in any case for an above-street-level dealer, but an above-street-level dealer, with a prior narcotics conviction, who wasn't found in any of the homes that he would now like to be detained in, who has sample resources to flee, who is facing overwhelming evidence that could result in an incredibly lengthy sentence, yes, in those limited cases, home detention probably is not useful.

THE COURT: Okay. Home detention is arguably less useful in cases involving danger than flight, right, because if somebody can be detained from home, they can still direct the elicit affairs of the alleged organization from home. So I can understand that with respect to safety concerns, but on flight, home detention is a pretty substantial hurdle for someone who wants to flee, no?

MR. SCOTTEN: I don't think so, your Honor. And obviously pretrial services can correct me on this, but I've actually been through this with officers on this before, the way that would work is, let's suppose that Mr. Miller is on home detention, he's allowed to leave for very limited circumstances like visiting his lawyer or going to church, and it's 5 o'clock and he doesn't come home from going to church.

The system will notify pretrial services that he's not

home, at which point they will call him. If he gives them a good reason, they'll give him some time to get home. If he doesn't pick up, they'll begin calling his guarantors, people close to him and see if they can tell them what's going on. They'll continue that for as much as time as they think is appropriate in their discretion. And then the following morning, they'll report to the court the infraction. It gives you plenty of time to flee, and this isn't just hypothetical. The defendant we mentioned in our footnote, that's exactly what he did. He just fled. And yes, the next day his flight was reported. That's 12 hours too late.

THE COURT: Where do you think Mr. Miller is going to go? What resources?

MR. SCOTTEN: We don't know exactly how many resources Mr. Miller has. It's a cash business.

THE COURT: Mr. Goldstein points out the transcript. It says that when he's trying to get Kinyon out of jail, he says I don't have any resources, financial resources, to help him out. So, if you all think that the recordings don't lie, they're powerful evidence, why is that not powerful evidence that he doesn't have the resources to go anywhere even if he wanted to?

MR. SCOTTEN: That was a good line that he used to get some money. And if the recordings don't lie, he came up with $50,000 in the course of a few days, which he then did use to

get Mr. Kinyon a lawyer. So, he does have resources. I mean, if we're going to accept the transcript, that's where it leaves you. He can get $50,000 by downing a couple of people for a couple days. He's got resources to retain a lawyer here. He's got $50,000 in a few days. He was able to put $15,000 in a cocaine investment. I don't know where his Dodge Charger is. The man has resources.

THE COURT: You take his passport and you take his travel documents, where is he going to go?

MR. SCOTTEN: I would suggest he'd likely go where most of the defendants who are at-large is, which is, you can hide right in the United States. I don't think he's going to the French Riviera to become an ex-pat, but you can escape being caught for a long time if you're smart enough to avoid a couple of things, which I won't put on the record, but I think the Court is aware. There's nothing that stops him from fleeing to the Bronx.

When the agents went to arrest him at what they thought was his home in New Jersey, which is where this child lives that he supposedly is going to care for now, and he wasn't there, and the woman there said he hadn't been there for several nights and they followed him to Bronx, they didn't find him there. We don't have a magical ability to find somebody hiding in a nation of 300 million people. The loss of a passport is not meaningful protection against flight within the very large continental

United States, especially when you have the kind of resources that Mr. Miller at least can put together, even if he doesn't have that cash in his pocket right now.

Subject to the Court's questions, I think those are all of the points that I wanted to cover. I mean, it comes down to the only factor in his favor is turning himself in. I think, otherwise, each of the four statutory factors is against him, which I think easily shows by a preponderance of the evidence his risk of flight, and we also think we've made out clear and convincing evidence of danger given the debt collection.

THE COURT: The other individuals who turned themselves in that met a different fate in front of Judge McCarthy, were they connected to this case?

MR. SCOTTEN: I don't know about the individual that was referred to as a couple days beforehand; I don't think she was. The individual the day after, yes, he was connected to this case. He's a codefendant. In fact, he's the person referred to as "Goat" in these line sheets who shows up as one of the conspiracy's regular customers.

THE COURT: And a named defendant?

MR. SCOTTEN: Yes, Davion McAdam, a/k/a "Goat."

THE COURT: I don't think I would want that nickname. What does that get you?

MR. SCOTTEN: Mr. McAdam is different in different ways. He's not as high up on the chain.

THE COURT: Right.

MR. SCOTTEN: He did have an outstanding probation warrant, which this defendant didn't have, so they're different in other ways. My point is, it's hardly dispositive, and it certainly shouldn't be dispositive for the second-in-command of a major narcotics trafficking organization.

THE COURT: Thank you.

Mr. Goldstein.

MR. GOLDSTEIN: Briefly, one thing that I think the government is sort of ignoring is what the security is for the bail. If this defendant is found to violate any order concerning his bail, his mother, who lives with her grandchild that the defendant was helping raise, would lose her house, literally be out on the street. His stepmother, who is also employed as a healthcare professional, would lose the house where she lived with the defendant's father before he died of bone marrow cancer about a month ago.

This is not the kind of situation where, hey, the defendant goes so what? Big deal. We're not talking about some friend who everybody says, oh, he must have gotten paid to put up the house. These are the closest family that a person can have.

The government also says that the marshals couldn't find the defendant when they went to New Jersey. That's true. First of all, they ignore the fact because they probably don't

102416m iller

know that his license was changed to the address that we're asking that he be held on home detention in. That's his great-aunt's address in Queens. So, at the time the marshals went to look for him, if they had checked the day before, they would have known where he was. He was either at her house or at his other aunt's house who lives in Poughkeepsie. He stayed there. I'm not saying he didn't.

The getting $50,000 for a lawyer, he didn't get $50,000 for the lawyer. He's not the one who gave the money to the lawyer. The Kinyons' child's mother did. And, to be sure, maybe some of the money came from this defendant, but certainly not all of it. The majority of it didn't.

So, as I said, I don't want to be redundant, it's apparent that the magistrate rendered a measured decision. Obviously, you have the discretion to change it, but I don't think there's enough here to do so.

THE COURT: Do you want to address the security of the package, Mr. Scotten?

MR. SCOTTEN: Yes, your Honor. It is a substantial package. I think our submission is that this falls under the category of cases where are there no conditions. That may sound harsh, but we're not pulling that out of nowhere. That's what the statute says. The presumption starts with no conditions would suffice.

I don't think the fact that the defendant has

apparently a very kind and loving family counts in his favor. No one will feel better if the defendant flees and leaves them in the lurch, but selling massive quantities of narcotics and sending people to beat people up for drug debts does not reflect a responsible person. It's someone who can well be expected to leave his closest family members in the lurch. So, we don't think putting up other people's homes should overcome a statutory presumption that there are no conditions.

And I'd note on that subject, your Honor, according to the pretrial services report, the defendant says he's lived at this Queens address for the last four months. And that's difficult to reconcile with the woman who is at the New Jersey address saying he just hadn't been there for a couple days. But even assuming that accurate, that four months, that's when he's on the wiretap sending people out to beat people up. That's when he's collecting $50,000.

And my friend is right, it's not his money; it's the money he gets from all the people who owe drug debts to this organization. He can still do that. He can do all those things from his Queens address because he's already done them.

To the extent the Court would like to hear more from us, obviously, we have the burden, so we're happy to answer any remaining questions the Court has.

THE COURT: Okay.

MR. GOLDSTEIN: I just think it's unfortunate to say

the defendant sent anybody to beat anybody up. There is nothing in that conversation that supports that view. Nothing. In fact, there's no evidence. This is something the other person said on his own. Then the defendant asked him, Did you get the money? That means he sent the person to beat somebody up?

Where did that come from?

THE COURT: Well, I think it's certainly the case that your client's reaction wasn't one of shock that the other person indicated that he was about to beat the person up. His bottom line is, Did you get the money or not?

MR. GOLDSTEIN: I understand, but to say that he sent somebody to beat somebody up is just not fair.

THE COURT: Well, I think -- I assume -- and Mr. Scotten, you'll correct me if I'm wrong -- this is based on what you say is the other evidence that establishes Mr. Miller's rank within the organization. So, this person "T" is "Tree," I guess, is lower on the totem pole to Mr. Miller.

MR. SCOTTEN: One of the disturbing things about "Tree" is we haven't identified and placed him, but, yes, given that at this point Mr. Miller is the senior person in the organization because Kinyon's in jail now, --

THE COURT: Right.

MR. SCOTTEN: -- combining that with the fact that he's clearly the one inquiring was the money got, does seem to mean the conversation standing on its own implies that relationship

and consistent with all the other evidence of Miller being in charge, which is people saying Miller is in charge.  These are coconspirator statements of Miller's his right hand, Miller's got it now that Kinyon's in jail, we think it's pretty clear that that's what's going on here.

MR. GOLDSTEIN:  Looking at the indictment, I don't see this other person's name.  He's not even in the indictment.

THE COURT:  "Tree" is in the wind.  Sorry.

MR. GOLDSTEIN:  I don't think he's in the wind either.

THE COURT:  I think the government acknowledges they don't know much about "Tree," but I think, again, I don't know what the strength of the evidence is in this regard.  I don't know what might be said about these informants the government has, but according to the government anyway, they have individuals who are saying that Mr. Miller slid in in response to Mr. Kinyon being arrested.

MR. SCOTTEN:  I should be careful --

MR. GOLDSTEIN:  If that's the case, why aren't there any transactions if he's taken over?  Nothing happens.  We're talking about Mr. Kinyon got arrested about three months ago, I remember right.  I assume the investigation didn't stop.  And the government admitted they had him under surveillance.  Nothing happened.  Nothing.

MR. SCOTTEN:  I wanted to just make sure I was clear on the record.  They're not coconspirator statements being relayed

by testifying witnesses. These are wiretap recordings of members of the conspiracy saying to each other he's in charge now. We also do have witness testimony to say he's second-in-command, but what I was specifically referring to actually were recorded conversations saying he's in charge.

THE COURT: Right, although, he sits fourth from the bottom in the indictment.

MR. SCOTTEN: You Honor, this has come up several times. We decided to alphabetize this indictment, which may have been a mistake since I know sometimes it can be read with Kinyon at top since he's the lead defendant, but everybody after that should be alphabetical, and nothing else can be inferred from their placement.

THE COURT: Is that a new thing you guys are doing?

MR. SCOTTEN: Mr. Clore informs me it is.

THE COURT: Because the Number 2 person, his nickname is "Powerful," which is a pretty good nickname if you're the Number 2.

MR. SCOTTEN: Turns out he's just physically strong.

THE COURT: He's stronger than "Pony" and "Goat."

MR. SCOTTEN: Apparently, your Honor.

THE COURT: Anything else?

MR. GOLDSTEIN: No.

THE COURT: Anything else?

MR. SCOTTEN: No.

THE COURT: Why don't you give me a few minutes to look over everything, if you would, please. Thank you.

(Recess)

THE COURT: We're here, as I said, because the government has appealed Judge McCarthy's decision to set bail conditions for Mr. Miller's release. We discussed what those conditions are. It is a *de novo* standard of review, although I do think Mr. Goldstein puts a fine point on it, which is that this wasn't a judge who just flipped a coin to reach a rash decision. This is obviously somebody who very carefully considered the competing arguments and consulted with the pretrial services officers on the case.

But it is a *de novo* review, and whether or not the government sought remand on both safety and flight grounds is, I guess, not dispositive here because it being *de novo* review. If the government is going to seek remand on somebody on both grounds, it should make crystal clear that that's what it's doing because certainly Mr. Goldstein, who I've known for many years, has a different view of what the application was. So, if it's a question of emphasis, that's one thing. But in any event, because this is a presumption case with respect to the flight issue, the question is whether or not there are a set of conditions that can assure the appearance of Mr. Miller.

Now, in terms of looking at the factors, starting with the charges and the weight of the evidence, I don't think

there's any question that Mr. Miller is facing at least at this point a ten-year mandatory minimum, and given the weight the government says it can attribute to the conspiracy and it places Mr. Miller, his place in the alphabet notwithstanding, towards the top of the pyramid within the organization, it's a pretty substantial amount of narcotics which would drive up the guideline range. And the government also suggests that there's a possibility of a 20-year mandatory minimum should it file a prior felony information.

In terms of the evidence, there are wiretaps of a number of the individuals in the conspiracy, including Mr. Kinyon and, for a brief period of time, Mr. Miller. According to the government, the recorded conversations paint a picture of Mr. Miller as perhaps the Number 2 in the organization that has engaged in wholesale and substantial narcotics trafficking for some period of time. And then there's also, as is laid out in the indictment, allegations of a money-laundering scheme that accompanies the narcotics scheme. Those are some of the factors that are required consideration under the statute.

In terms of facts dealing with Mr. Miller and his history, as Mr. Goldstein points out, yes, there's some criminal history, but it's nothing akin to what's been charged here. And he does note the absence of any bench warrants, which is fair game, because certainly whenever there is a bench warrant, the

government makes sure to put a big yellow highlighter on that when they get the pretrial services report.

But the government's argument is the nature of this conspiracy is such that Mr. Miller doesn't get his hands dirty, and so it's not the kind of case you might see in other situations where the street-level person is the one who has a series of possession charges in the state court, and, therefore, it's not the kind of case that's going to generate that kind of criminal history. Be that as it may, the bottom line is Mr. Miller doesn't have the type of criminal history that one sees in other types of narcotics cases.

Then there's the question of what the impact is of Mr. Miller turning himself in. Mr. Goldstein has laid out the chronology behind that to explain the gap in time between when the charges came down and when Mr. Miller actually surrendered, and I accept that representation at face value. In other words, this isn't a situation where Mr. Miller decided to hide in an attic for six days and then suddenly decided to turn himself in. He was pretty proactive in this process in dealing with and through Mr. Goldstein. Now, I think that is certainly a factor that cuts in Mr. Miller's favor. Although it appears as though at least one other person in this case also turned himself in, and it does raise the question about whether that is a tactic; that an individual says, well, they're going to find me anyways right now because I don't really have the wherewithal at this

102416m iller

point to flee. So if I turn myself in, then at least that allows for the argument that I am not likely to be a risk of flight. Apparently, Judge McCarthy is a magnate for these kinds of individuals because there was another person in a different case who also turned himself in. But it's also not the kind thing that one sees as a matter of routine in these types of cases. So, as I said, I think it's a factor that does cut somewhat in favor of Mr. Miller.

Then there's also the question of danger. And, you know, it's the combination of Mr. Miller's alleged role in the conspiracy, in the organization, and then there's this one conversation with "Tree" where it is pretty clear that "Tree" is talking about how he was prepared to rough somebody up to collect a debt. And Mr. Goldstein showers that with skepticism by saying that that doesn't prove that that's something Mr. Miller directed or that he asked "Tree" to do, that the government hasn't even indicted ""Tree," so we don't really know who "Tree" is. So I think those are all fair points.

I do think that to the extent there is evidence and the government has proffered this evidence, and I'm this no position to question it, that there is other evidence that places Mr. Miller in a leadership role. It's clear from the conversation that it's not Mr. Miller the one who almost had to do the beating; in other words, once again, he's not getting his hands dirty. "Tree" is the one who is prepared to rough up the

person and ultimately collect the bread, as it said in the recording.

It's also clear that Mr. Miller glided right past the fact that "Tree" said that he almost had to beat the person up. There's no surprise at that. It's almost like that's just what "Tree" does. And the bottom line is, from Mr. Miller's perspective, they needed the money. And if you look at some of the other conversations that are attached to the government's exhibit, it's clear to me that Mr. Miller is the one calling the shots. He's talking, in a couple of different instances, about having to get their act together, having to take care of the lawyer and having to take care of this and that, all very colorful language, by the way, and not the kind of conversation of the worker bee.

So, I think there is something to the government's concern about dangerousness, not only in terms of potential threats of violence from debt collection, but also just continuing the affairs of the operation.

With respect to the package, it's $100,000 PRB. It's secured by Mr. Miller's mother's residence in North Carolina, and then the stepmother also put up her house. I assume there are no issues about the equity in the two residences because that wasn't raised. So, I'm willing to assume for the sake of argument that that would cover the bond that has been approved by Judge McCarthy. And of course, there's home detention.

And then Mr. Goldstein also suggested something that was in the back of my mind, that maybe the conditions could be modified to limit phone use by Mr. Miller. And I did give that some consideration.

Before I forget about it, my view on that is I think that's very difficult to enforce because the government would have to play a became game of whack-a-mole in terms of what phone Mr. Miller might be using, but I did consider that, even before Mr. Goldstein raised it.

And the security certainly is not insubstantial. These are people who are close to Mr. Miller, or at least that's the proffer made by Mr. Goldstein, and I take that at face value, and I think to me, that's the best argument in Mr. Miller's favor. But in my view, this doesn't rebut the presumption that Mr. Miller is a risk of flight. He has access to cash, and that's because of his role in the organization, it's because of the quantity of narcotics that this organization has been involved in selling. And it's clear in these conversations that he's played an active role in trying to assemble resources, whether it's to raise money for Kinyon's defense or raise money for other things, it's not entirely clear from all the conversations, but he has a very active role. He has a leadership role. There are people out there threatening others to collect debts. And this is an individual who now knows, whether what he knew at the time he decided to turn himself in

and talked to Mr. Goldstein, he knows that he's facing a substantial amount of time; and he also knows that the government, at least appears to be quite confident that its wiretap and other evidence is going to convincingly demonstrate his major role in this organization.

So, while these conditions are substantial, in my view, they are not enough to rebut the presumption because Mr. Miller has a tremendous incentive to flee and avoid justice, and he may very well have the resources not only to hide, but also to take care of those who might be adversely affected by his decision, assuming he cares enough not to make a decision that would hurt others.

And while I recognize that home monitoring is an impediment, it is not something that makes flight impossible. As I think we all know from personal experience in the system that there are people who flee, even after they have been subject to home detention. So that, combined with the evidence of dangerousness, in my view, is enough in this case to remand Mr. Miller.

Is there anything else, Mr. Scotten?

MR. SCOTTEN: Nothing from the government.

THE COURT: Mr. Goldstein, anything else?

MR. GOLDSTEIN: No.

THE COURT: All right. Then we are adjourned. Thank you.

102416m iler

Thank you, marshals.

- - -

Certified to be a true and accurate

transcription of my stenographic

notes.

//s_____
U.S. District Court
Official Court Reporter